UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF OHIO
EASTERN DIVISION

| | | |
|---|---|---|
| KATHLEEN F. HARDMAN, | ) | CASE NO. 5:16CV2795 |
| | ) | |
| | ) | JUDGE DONALD C. NUGENT |
| Plaintiff, | ) | |
| | ) | Magistrate Judge George J. Limbert |
| v. | ) | |
| | ) | |
| NANCY BERRYHILL[1], | ) | |
| COMMISSIONER OF SOCIAL | ) | REPORT AND RECOMMENDATION |
| SECURITY ADMINISTRATION, | ) | OF MAGISTRATE JUDGE |
| | ) | |
| Defendant. | ) | |

Plaintiff Kathleen F. Hardman ("Plaintiff") requests judicial review of the final decision of the Commissioner of Social Security Administration ("SSA") ("Defendant") denying her applications for Disability Insurance Benefits ("DIB") and Supplemental Security Income (SSI"). ECF Dkt. #1.  In her brief on the merits, filed on April 17, 2017, Plaintiff asserts that the administrative law judge ("ALJ") failed to: (1) articulate a valid reason at Step Two when he failed to find that her depression and anxiety conditions were severe impairments; (2) provide valid reasons for rejecting the opinions of her treating sources Dr. Vitarella and Kristen Drollinger; (3) properly evaluate Plaintiff's credibility; and (4) correctly find that Plaintiff could return to her past relevant work as a bank teller.  ECF Dkt. #14.  On June 28, 2017, Defendant filed a brief on the merits.  ECF Dkt. #17.  On July 10, 2017, Plaintiff filed a reply brief.  ECF Dkt. #18.

For the following reasons, the undersigned recommends that the Court AFFIRM the ALJ's decision and DISMISS Plaintiff's complaint in its entirety WITH PREJUDICE.

## I.    FACTUAL AND PROCEDURAL HISTORY

In December 2013, Plaintiff protectively filed applications for DIB and SSI alleging disability beginning December 2, 2013 due to fibromyalgia, depression, anxiety, a stroke, memory

---

[1]On January 23, 2017, Nancy A. Berryhill became the acting Commissioner of Social Security, replacing Carolyn W. Colvin.

problems, fatigue, and colitis.  ECF Dkt. #11 at 195-206, 272.[2]  Plaintiff's applications were denied initially and upon reconsideration.  *Id.* at 80-133, 136-163.  Following the denial of her applications, Plaintiff requested an administrative hearing, and on September 24, 2015, an ALJ conducted the hearing and accepted the testimony of Plaintiff, who was represented by counsel, and a vocational expert ("VE").  *Id.* at 34, 164.  On October 9, 2015, the ALJ issued a decision denying Plaintiff's applications for DIB and SSI.  *Id.* at 16-26.  Plaintiff requested a review of the hearing decision, and on September 23, 2016, the Appeals Council denied review.  *Id.* at 1, 14.

On November 17, 2016, Plaintiff filed the instant suit seeking review of the ALJ's decision. ECF Dkt. #1.  Plaintiff filed a brief on the merits on April 17, 2017.  ECF Dkt. #14.  On June 28, 2017, Defendant filed a merits brief.  ECF Dkt. #17.  Plaintiff filed a reply brief on July 10, 2017. ECF Dkt. #18.

**II**.  **ALJ'S DECISION**

In his decision, the ALJ found that Plaintiff had not engaged in substantial gainful activity since December 2, 2013, her alleged onset date.  ECF Dkt. #11 at 21.

The ALJ found that Plaintiff had the severe impairments of fibromyalgia and colitis.  ECF Dkt. #11 at 21.  He further found that these impairments, individually or in combination, did not meet or equal any of the Listing of Impairments in 20 C.F.R. Part 404, Subpart P, Appendix 1 ("Listings").  *Id.* at 23.

The ALJ thereafter determined that Plaintiff had the residual functional capacity ("RFC") to perform light work with limitations of occasional kneeling and crawling, never climbing ladders, ropes or scaffolds, and avoiding workplace hazards such as unprotected heights and dangerous, moving machinery.  ECF Dkt. #11 at 23.

The ALJ went on to find that based upon the RFC that he determined for Plaintiff and the VE's testimony, Plaintiff could perform her past relevant work as a bank teller.  ECF Dkt. #11 at 25.

---

[2]All citations to the transcript refer to the page numbers assigned when the transcript was filed in the CM/ECF system rather than the page numbers assigned when the transcript was compiled.  This allows the Court and the parties to easily reference the transcript as the page numbers of the .PDF file containing the transcript correspond to the page numbers assigned when the transcript was filed in the CM/ECF system.

He therefore found that Plaintiff was not under a disability as defined in the Social Security Act from December 2, 2013, through the date of his decision.  *Id.*

### III.    STEPS TO EVALUATE ENTITLEMENT TO SOCIAL SECURITY BENEFITS

An ALJ must proceed through the required sequential steps for evaluating entitlement to social security benefits.  These steps are:

1.   An individual who is working and engaging in substantial gainful activity will not be found to be "disabled" regardless of medical findings (20 C.F.R. §§ 404.1520(b) and 416.920(b) (1992));

2.   An individual who does not have a "severe impairment" will not be found to be "disabled" (20 C.F.R. §§ 404.1520(c) and 416.920(c) (1992));

3.   If an individual is not working and is suffering from a severe impairment which meets the duration requirement, see  20 C.F.R.  § 404.1509 and 416.909 (1992), and which meets or is equivalent to a listed impairment in 20 C.F.R. Pt. 404, Subpt. P, App. 1, a finding of disabled will be made without consideration of vocational factors (20 C.F.R. §§ 404.1520(d) and 416.920(d) (1992));

4.   If an individual is capable of performing the kind of work he or she has done in the past, a finding of "not disabled" must be made (20 C.F.R. §§ 404.1520(e) and 416.920(e) (1992));

5.   If an individual's impairment is so severe as to preclude the performance of the kind of work he or she has done in the past, other factors including age, education, past work experience and residual functional capacity must be considered to determine if other work can be performed (20 C.F.R. §§ 404.1520(f) and 416.920(f) (1992)).

*Hogg v. Sullivan*, 987 F.2d 328, 332 (6th Cir. 1992).  The claimant has the burden to go forward with the evidence in the first four steps and the Commissioner has the burden in the fifth step.  *Moon v. Sullivan*, 923 F.2d 1175, 1181 (6th Cir. 1990).

### IV.    STANDARD OF REVIEW

Under the Social Security Act, the ALJ weighs the evidence, resolves any conflicts, and makes a determination of disability.  This Court's review of such a determination is limited in scope by §205 of the Act, which states that the "findings of the Commissioner of Social Security as to any fact, if supported by substantial evidence, shall be conclusive."  42 U.S.C. §405(g).  Therefore, this Court's scope of review is limited to determining whether substantial evidence supports the findings of the Commissioner and whether the Commissioner applied the correct legal standards.  *Abbott v. Sullivan*, 905 F.2d 918, 922 (6th Cir. 1990).

The substantial-evidence standard requires the Court to affirm the Commissioner's findings if they are supported by "such relevant evidence as a reasonable mind might accept as adequate to support a conclusion." *Cole v. Astrue*, 661 F.3d 931, 937, citing *Richardson v. Perales*, 402 U.S. 389, 401, 91 S.Ct. 1420, 28 L.Ed.2d 842 (1971) (citation omitted). Substantial evidence is defined as "more than a scintilla of evidence but less than a preponderance." *Rogers v. Comm'r of Soc. Sec.,* 486 F.3d 234 (6th Cir. 2007). Accordingly, when substantial evidence supports the ALJ's denial of benefits, that finding must be affirmed, even if a preponderance of the evidence exists in the record upon which the ALJ could have found plaintiff disabled. The substantial evidence standard creates a "'zone of choice' within which [an ALJ] can act without the fear of court interference." *Buxton v. Halter*, 246 F.3d 762, 773 (6th Cir.2001). However, an ALJ's failure to follow agency rules and regulations "denotes a lack of substantial evidence, even where the conclusion of the ALJ may be justified based upon the record." *Cole, supra*, citing *Blakely v. Comm'r of Soc. Sec.*, 581 F.3d 399, 407 (6th Cir.2009) (citations omitted).

## V.   RELEVANT MEDICAL EVIDENCE

### A.   RELEVANT PHYSICAL IMPAIRMENTS

Plaintiff was diagnosed with colon cancer in 2009 and underwent a colectomy. ECF Dkt. #11 at 366. She underwent chemotherapy thereafter but did not complete the course. *Id*. She underwent a CT scan of her chest on December 9, 2010 and had a left upper lobe tumor that was positive for non-small-cell adenocarcinoma. *Id*. The tumor was excised. *Id*.

On July 11, 2012, Plaintiff underwent a colonoscopy to obtain biopsies due to her complaints of diarrhea and left lower quadrant abdominal pain and history of lymphocystic colitis. ECF Dkt. #11 at 360. The postoperative diagnosis was sigmoid diverticulum. *Id*. at 410. The biopsy revealed lymphocytic colitis. *Id*. at 409, 759.

On April 17, 2013, Plaintiff presented to the emergency room complaining of exacerbation of her fibromyalgia pain in her right shoulder and arm. ECF Dkt. #11 at 524, 656. Plaintiff explained that she had been on Cymbalta for the last 8 months for financial reasons and she was unable to see her treating physician for the same reason. *Id*. Physical examination revealed limited range of motion in the right shoulder secondary to pain with tenderness to palpation. *Id*. The

-4-

emergency room physician explained that the emergency room did not treat chronic pain and she needed to see her treating physician.  *Id.*  However, he diagnosed Plaintiff with acute right shoulder and arm pain and a history of fibromyalgia, gave her Percocet, and sent her home with NSAIDs. *Id.*     On May 3, 2013, Plaintiff presented to Dr. Brine for her complaints of fatigue and joint pain in her hips, shoulders, neck and hands.  ECF Dkt. #11 at 566.  He noted Plaintiff's history of fibromyalgia and her complaints of worsening pain.  *Id.*  Upon examination, Dr. Brine noted Plaintiff's pain in the cervical spine with range of motion, restricted bending, restricted external rotation of the shoulders, joint swelling of the hands, pain to palpation, and mild crepitus of the shoulders and knees.  *Id.* at 567.  He diagnosed Plaintiff with arthritis at multiple sites not otherwise specified, fibromyalgia, and colitis.  *Id.*  He ordered blood tests for arthritis, thyroid and autoimmune diseases, as well as a urinalysis, which came back essentially normal.  *Id.*  at 567-568.  He started Plaintiff on medication for her fibromyalgia.  *Id.* at 568.

On June 10, 2013, Plaintiff presented to Dr. Brine for follow up of her fibromyalgia.  ECF Dkt. #11 at 562.  She reported improving symptoms, such as improved functionality and insomnia, since beginning NSAIDs with Flexeril at night.  *Id.* She did complain of increased anxiety.  *Id.* Physical examination revealed positive joint pain to palpation, mild swelling, mild crepitus to the shoulder and knees, and multiple trigger point tenderness.  *Id.* at 564.  Dr. Brine diagnosed arthritis at multiple sites not otherwise specified, fibromyalgia, colitis not otherwise specified, and depression with anxiety.  *Id.*  He refilled Plaintiff's medications, added Sertraline for Plaintiff's depression with anxiety, and he suggested aquatic therapy.  *Id.*

Plaintiff presented to her treating physician, Dr. Vitarella, on July 22, 2013 and she reported that her fibromyalgia pain was improving, although she still complained of joint pain, stiffness and swelling.  ECF Dkt. #11 at 484, 557.  Dr. Vitarella's physical examination yielded normal results. *Id.* at 486.  She diagnosed Plaintiff with fibromyalgia and depression with anxiety.  *Id.*  She prescribed medications for Plaintiff and encouraged her to do aerobic exercise 3-5 times per week for 30 minutes at a time.  *Id.*  Plaintiff reported that the pain was controllable at this time and Dr. Vitarella indicated that if the pain became too intense, she would prescribe Tramadol.  *Id.*

On October 16, 2013, Plaintiff presented to Dr. Vitarella for a reaction to Zoloft.  ECF Dkt. #11 at 481, 549.  Dr. Vitarella noted that Plaintiff presented with significant life stressors as her sister was critically ill and had almost died three times in that month and another sister had died in November, which made late October and November harder for her.  *Id*.  She also complained of being itchy and having anxiety.  *Id*.  Dr. Vitarella found no abnormalities upon physical examination and she diagnosed fibromyalgia, depression with anxiety, and prescribed Vistaril for anxiety and itching.  *Id*. at 483.

On October 17, 2013, Plaintiff presented to the emergency room explaining that she developed dizziness the night prior, with some staggering, slurring of her speech, and nausea.  ECF Dkt. #11 at 506, 641.  Tests were conducted and Plaintiff was diagnosed with nonspecific dizziness and transient dysathria resolved, with no evidence of cerebrovascular ischemia.  *Id*. at 507, 650.

On October 18, 2013, Plaintiff presented to Dr. Frimpong for a follow up from her recent emergency room visit for a transient ischemic attack ("TIA").  ECF Dkt. #11 at 479.  She said that she had no slurred speech, blurry vision or neurological deficits since her October 16, 2013 TIA.  *Id*.  She reported that her mood had improved with Zoloft.  *Id.*  Upon examination, Dr. Frimpong found that Plaintiff was alert and oriented and had a normal examination.  *Id*. He diagnosed her with fibromyalgia, depression with anxiety, and TIA.  *Id*. at 479-480.

On November 11, 2013, Plaintiff presented to Dr. Frimpong for a follow up from her recent emergency room visit for a TIA.  ECF Dkt. #11 at 477.  She said that she had no slurred speech, blurry vision or neurological deficits since her October 16, 2013 TIA.  *Id*.  She reported that her mood had improved with Zoloft.  *Id.*  Upon examination, Dr. Frimpong found that Plaintiff was alert and oriented and had a normal examination.  *Id*. He diagnosed her with depression with anxiety, TIA, and hyperlipidemia.  *Id*.

On January 9, 2014, Plaintiff presented to Dr. Vitarella for follow up of her medications.  ECF Dkt. #11 at 542, 637.  She complained of increasing body aches and stiffness which worsened in the cold.  *Id*.  She related that her fibromyalgia pain had been flaring as of late.  *Id*.  Plaintiff also complained of a rash on her face, elbow and knees over the last two months, and a nearly 30 pound weight gain over the past year.  *Id*.  Upon physical examination, Dr. Vitarella noted a rash on

-6-

Plaintiff's face and in her elbow creases.  *Id*.  She diagnosed Plaintiff with fibromyalgia, TIA, rash, and weight gain.  *Id*. at 543.  Dr. Vitarella ordered blood tests and cultures and modified Plaintiff's medications and added Amitriptyline and a steroid cream.  *Id*.

On January 23, 2014, the lab cultures showed suspected staph infection on Plaintiff's neck and face.  ECF Dkt. #11 at 620.  She was prescribed Keflex and Acyclovir.  *Id*.

On March 4, 2014, Dr. Vitarella completed a physical RFC questionnaire.  ECF Dkt. #11 at 627.  She opined that Plaintiff was limited to lifting and/or carrying up to 8 pounds and could do so for only 1/3 of an 8-hour workday due to her refractory fibromyalgia despite medications.  *Id*.  She further opined that Plaintiff's abilities to sit and stand/walk were not affected by her fibromyalgia and Plaintiff could only occasionally climb, balance, stoop, crouch, kneel and crawl because of her fibromyalgia.  *Id*.  Dr. Vitarella also opined that Plaintiff had no restrictions in dealing with heights, chemicals, dust, noise, fumes, or vibrations, but had to avoid moving machinery and temperature extremes due to her fibromyalgia.  *Id*.  She indicated that Plaintiff would be absent from work about 2 days per month due to pain or fatigue and would be off-task up to 10% of the workday due to pain or fatigue.  *Id.* at 628.  Dr. Vitarella opined that Plaintiff would need to lie down for ten minutes throughout the course of the workday, would be able to use her hands up to 70% of the workday, and would require about two unscheduled breaks per day if she worked a sedentary job.  *Id*.

March 31, 2014 progress notes from Dr. Vitarella show that Plaintiff presented complaining of a worsening of her fibromyalgia symptoms.  ECF Dkt. #11 at 709.  She was diagnosed with fibromyalgia, depression with anxiety, colitis not otherwise specified, abnormal weight gain, and gastric esophageal reflux syndrome.  *Id*. at 711.  She was referred to a rheumatologist as she had never been to one and the Elavil that was prescribed for her fibromyalgia pain was not helping.  *Id.*

On May 13, 2014, Plaintiff presented to Dr. Vitarella complaining of a two-week history of swelling in her legs, feet, hands and chest, along with shortness of breath and muscle weakness.  ECF Dkt. #11 at 706.  She was concerned with her symptoms due to her sister's death from congestive heart failure and her other sister's diagnosis with the disease.  *Id*.  Plaintiff denied chest pain or pressure or fever or chills, but indicated that she had arm and leg muscle aches.  *I*d.  Physical examination was normal, except for mild soft swelling in the feet and ankles.  *Id*.  at 707.  Plaintiff

-7-

was diagnosed with shortness of breath, edema, depression with anxiety, hyperlipidemia, fibromyalgia, fatigue and malaise, and myalgia.  *Id.*  She was sent for an echocardiogram and blood tests were ordered.  *Id.*

Plaintiff presented to the emergency room on July 5, 2014 complaining of lower extremity edema over the last month that had gotten worse.  ECF Dkt. #11 at 761.  Physical examination revealed no abnormalities and she was diagnosed with lower extremity edema and given a prescription for compression stockings.  *Id*. at 761-762.

Plaintiff presented to Dr. Enders on July 7, 2014 complaining of swollen feet and weight gain, although test results for such conditions came back negative.  ECF Dkt. #11 at 740.  Some edema was noted upon physical examination.  *Id*.  Dr. Enders diagnosed Plaintiff with edema and weight gain and ordered compression stocking and a 24-hour cortisol test.  *Id.*

Plaintiff presented to Dr. Enders on July 31, 2014 for the swelling of her legs, which she reported had resolved with a dietary modification.  ECF Dkt. #11 at 738.

On August 21, 2014, Plaintiff presented to Ms. Boville, a CRNP for Dr. Vitarella, for her complaints of bilateral foot swelling and follow up of her fibromyalgia and depression with anxiety.  ECF Dkt. #11 at 736.  Plaintiff noted that her health insurance changed and her medications may need changed as a result.  *Id*.  Upon examination, Plaintiff's medications were changed.  *Id*.

Plaintiff presented to Dr. Enders on September 23, 2014 for an evaluation of her fibromyalgia pain.  ECF Dkt. #11 at 734.  She related that the Gabapentin medication that he prescribed helped significantly, although she had occasional nerve pain that was shocking in character.  *Id*.  Upon physical examination, Dr. Enders diagnosed fibromyalgia, depression with anxiety, and neuropathy.  *Id*. He continued Plaintiff's medications and started her on Sertaline Hydrochloride for her depression with anxiety.  *Id.* at 735.

On October 15, 2014, Plaintiff presented to Dr. Enders for her complaints of fibromyalgia pain.  ECF Dkt. #11 at 732.  She reported that it was better for the most part and her depression was better for the most part as well.  *Id*.  Dr. Enders continued Plaintiff's medications.  *Id*. at 733.

December 8, 2014 progress notes from Dr. Enders, M.D., show that Plaintiff presented for follow up and reported that she was losing weight and still had some depression, but was feeling

-8-

better.  ECF Dkt. #11 at 730.  She indicated that she felt overwhelmed due to her fibromyalgia and she reported more pain since winter started.  *Id.*  She stated that her fibromyalgia pain was better than it was, although she still had problems concentrating.  *Id.*  Dr. Enders diagnosed Plaintiff with fibromyalgia, depression with anxiety and hyperlipidemia, and he increased Plaintiff's Gabapentin medication.  *Id.* at 730-731.

Progress notes from Dr. Enders dated January 27, 2015 indicate that Plaintiff presented for redness on her face, fatigue in the morning and pain and swelling in her hands in the morning.  ECF Dkt. #11 at 777.  Physical examination was normal and Dr. Enders diagnosed Plaintiff with hand pain, drowsiness and depression with anxiety.  *Id.*  He ordered blood tests and suggested that Plaintiff splint her wrists at night.  *Id.* at 778.  He also changed some of her medications.  *Id.*

On March 11, 2015, Plaintiff underwent an esophagogastroduodenoscopy which revealed that she had gastritis, a hiatal hernia and reflux esophagitis.  ECF Dkt. #11 at 782, 819.

Dr. Enders' May 4, 2015 progress notes show that Plaintiff followed up regarding her fibromyalgia and complaints of swelling and muscle pain which she always has during weather changes.  ECF Dkt. #11 at 814.  She reported playing with her grandchildren several times per day but no exercise.  *Id.*  She was encouraged to start an exercise program 30 minutes per day 5 to 7 days per week.  *Id.*

July 5, 2015 progress notes from urgent care show that Plaintiff presented with right knee pain after she fell two weeks prior in her mother's yard.  ECF Dkt. #11 at 799.  Physical examination revealed no knee stiffness or joint tenderness, a normal gait, normal range of motion and no muscle weakness.  *Id.* at 800.  Plaintiff was diagnosed with injury and sprain of the knee and told to rest, ice, compress and elevate her knee.  *Id.* at 800-801.

On July 31, 2015, Dr. Krebs evaluated Plaintiff for her chief complaint of knee pain and other complaints of bilateral hand pain, constipation, fatigue, and hip pain.  ECF Dkt. #11 at 803.  Plaintiff was diagnosed with depression, carpal tunnel syndrome, erosive gastritis, diarrhea, Vitamin D deficiency, coronary artery disease, dermatitis, neuropathy, fibromyalgia, hypercholesterolemia, allergic rhinits, acute right knee pain, left ankle pain, and bilateral hip pain.  *Id.*  Medications were modified and added, x-rays were ordered, and stretching exercises were given.  *Id.* at 803-806.

## B.    RELEVANT MENTAL IMPAIRMENTS

January 25, 2011 hospital discharge notes from a physical impairment indicate that Plaintiff was diagnosed with generalized anxiety disorder and depression and she was given Cymbalta which made her feel better.  ECF Dkt. #11 at 368.

On October 23, 2012, Plaintiff presented to Dr. Kedia, her primary care physician, upset and crying because she had lost her job, had moved, and her sister was in hospice care.  ECF Dkt. #11 at 390.  He found her affect appropriate, her mood depressed, and her insight and judgment to be normal.  *Id.*  Dr. Kedia diagnosed Plaintiff with depressive disorder and referred her to Portage Path Behavioral Health for psychiatric help and a psychologist.  *Id.*

Plaintiff presented to Kristen Drollinger, PC-CR at Portage Path on October 23, 2012 for an assessment.  ECF Dkt. #11 at 468.  Plaintiff reported no prior mental health treatment and explained that she was feeling sad and depressed for the last five weeks, with on and off feelings of depression all of her life.  *Id.*  She was on Cymbalta but her medication was switched to Celexa five weeks ago, and she complained of difficulty falling and staying asleep, loss of appetite and weight, anxiety and panic, and frequent unprovoked crying spells.  *Id.*  She related that she lost her job, did not have her own place to live and was not taking care of herself.  *Id.*  She also reported that her older sister was in hospice care and she was having trouble with that.  *Id.*  Plaintiff indicated that she planned on applying for disability due to her fibromyalgia for which she was diagnosed in 2001.  *Id*. at 470-471.

Upon examination, Ms. Drollinger found Plaintiff to be cooperative, with good eye contact and the ability to relate well.  ECF Dkt. #11 at 473.  She found Plaintiff fully oriented with an appropriate affect, an anxious and depressed mood, and no abnormal thought content, an intact memory, adequate concentration, and fair insight and judgment.  *Id*. at 474.  Ms. Drollinger diagnosed Plaintiff with recurrent moderate major depressive disorder, generalized anxiety disorder, and she assessed her global range of functioning at 53, indicative of moderate symptoms.  *Id*. at 474-476.  She assigned a therapist for Plaintiff.  *Id.*

Plaintiff presented to Michael Hovancsek, P.C.C.-S. at Portage Path on October 31, 2012 and reported that her sister was in hospice care and not expected to make it through the night.  ECF Dkt. #11 at 466, 611.  She also reported financial problems and that she was taking care of her other sister

-10-

who is handicapped.  *Id*. Mr. Hovanscek found that Plaintiff's eye contact was avoidant, she had no cognitive impairment, she was cooperative, and had a labile affect and anxious and depressed mood. *Id*.  They discussed techniques for Plaintiff to deal with her stressors and discussed the range of services that was available to her.  *Id.*  Plaintiff reported feeling much calmer after her session with Mr. Hovanscek.  *Id*.

Plaintiff presented to Mr. Hovancsek on November 29, 2012 and reported that her sister had died and Plaintiff was trying to figure out how to survive with her own health problems and her inability to work.  ECF Dkt. #11 at 465, 610.  She reported that she was going to apply for disability benefits.  *Id.*  Mr. Hovancsek found Plaintiff's mental status to be appropriate, her mood to be anxious, and her insight and judgment to be fair.  *Id*.

On February 4, 2013, Plaintiff called Portage Path and asked how to apply for disability benefits.  ECF Dkt. #11 at 463.  She was directed to the website in which to apply.  *Id*.

Plaintiff presented to Mr. Hovancsek on February 28, 2013 for therapy and discussed her sister's death and caring for the other sister who had ongoing medical problems.  ECF Dkt. #11 at 462, 606.  Mr. Hovacsek noted that Plaintiff had average eye contact, no cognitive impairment, an appropriate affect and an anxious and depressed mood.  *Id*.  He found her thought process to be logical and her insight and judgment to be fair.  *Id.*

Mr. Hovancsek treated Plaintiff on May 15, 2013 and she reported that her fibromyalgia was acting up and she had to go to the emergency room recently.  ECF Dkt. #11 at 460, 603.  Mr. Hovancsek found that Plaintiff's affect was appropriate, her mood was depressed and her insight and judgment were fair.  *Id*.

Progress notes from Ms. Drollinger indicate that she treated Plaintiff on June 14, 2013 and Plaintiff reported that she was struggling to find a full–time job because of her fibomyalgia.  ECF Dkt. #11 at 458, 601.  She discussed her sister's death from congestive heart failure in November of 2012 and she related that her other sister was also diagnosed with the same condition one month later.  *Id*.  Plaintiff indicated that she and her husband moved in with her sister to help with 24-hour care.  *Id*.  Ms. Drollinger found that Plaintiff had average eye contact, a flat affect, a depressed mood and fair insight and judgment.  *Id.*

July 12, 2013 Portage Path notes indicate that Plaintiff presented to Ms. Drollinger for therapy and reported that her sister had a mild heart attack, but was released from the hospital the same day and was doing well.  ECF Dkt. #11 at 456, 597.  Plaintiff indicated that her anxiety was not as intense, but was still present, and she was sleeping better. *Id*.  Plaintiff discussed her ongoing fibromyalgia pain and brought pictures of the swelling in her hands from that condition.  *Id*. Ms. Drollinger found that Plaintiff had average eye contact, no cognitive impairment, an appropriate affect, a depressed mood, and fair insight and judgment.  *Id*.

Ms. Drollinger treated Plaintiff on August 9, 2013, when Plaintiff presented for therapy and reported that she was excited that she had gotten a new part-time job, but was nervous about being able to perform well with her fibromyalgia.  ECF Dkt. #11 at 454, 595.  Plaintiff indicated that her doctor had increased her Zoloft dosage and she noticed that her anxiety had decreased.  *Id*.  Ms. Drollinger noted that Plaintiff had average eye contact, an appropriate affect, a depressed mood, and fair insight and judgment.  *Id.*

October 11, 2013 progress notes from Ms. Drollinger indicate that Plaintiff presented reporting that her sister had suffered two strokes and multiple seizures and had been in and out of the hospital.  ECF Dkt. #11 at 591.  She reported that doctors were unsure if her sister would make it because they found bleeding in her brain.  *Id*.  She also indicated that she was trying to spend time with her family and grandchildren in particular, and work was a "nice break."  *Id*.  She reported that she was planning to see her doctor to change her medications because her short term memory was "really bad" lately.  *Id*.  Ms. Drollinger found that Plaintiff had average eye contact, slowed activity, a euthymic and depressed mood, appropriate affect, and fair insight and judgment.  *Id*.

On November 1, 2013, Plaintiff presented to Ms. Drollinger and reported that her sister came home from rehabilitation and was doing well, but Plaintiff had a "mini-stroke" on October 17, 2013.  ECF Dkt. #11 at 448, 589.  Ms. Drollinger noted that Plaintiff had average eye contact, appropriate affect, a depressed mood, and fair insight and judgment.  *Id*.

On November 6, 2013, Plaintiff called Portage Path and left a voicemail for Ms. Drollinger asking for assistance in helping her to apply for disability benefits and to contact an attorney.  ECF Dkt. #11 at 447, 588.  Ms. Drollinger noted that she informed Plaintiff of Portage Path's role in

-12-

assisting clients who were filing for such benefits and she explained that Plaintiff could sign a release of information form for her attorney so that her attorney could help her fill out the paperwork and have the proper medical information to file. *Id.*

Plaintiff presented to Ms. Drollinger on November 11, 2013 for therapy and reported on her sister's worsened medical condition.  ECF Dkt. #11 at 450.  Plaintiff also reported that her own short-term memory was getting really bad and she was going to call her doctor about changing her medications. *Id.*  Ms. Drollinger found that Plaintiff's affect was appropriate, her eye contact was average, her mood was depressed, and her insight and judgment were fair. *Id.*

On November 22, 2013, Plaintiff presented to Ms. Drollinger and reported that her sister continued to improve although she still had trouble remembering things. ECF Dkt. #11 at 445, 586. Ms. Drollinger found Plaintiff's affect to be appropriate, with an anxious and depressed mood, and fair insight and judgment. *Id.*

Progress notes dated December 20, 2013 from Ms. Drollinger at Portage Path indicate that Plaintiff presented reporting that she felt overwhelmed lately due to caring for her sister and the holidays.  ECF Dkt. #11 at 443, 584.  She explained that she sat down to complete her disability paperwork but became confused and too overwhelmed. *Id.*  Ms. Drollinger found that Plaintiff's mental activity was slowed, her eye contact was average, her affect was flat and her mood was depressed. *Id.* She found Plaintiff's insight and judgment to be fair and her thought process to be blocked. *Id.*

Also on December 20, 2013, Ms. Drollinger completed a medical source statement regarding Plaintiff.  ECF Dkt. #11 at 441.  She concluded that Plaintiff had no observable limits in: understanding and memory, or in carrying out very short and simple instructions; performing activities within a schedule; sustaining an ordinary routine without special supervision; making simple work-related decisions; completing a normal workday or workweek without interruptions from psychologically-based symptoms and performing at a consistent pace; interacting appropriately with the general public; accepting instructions and responding appropriately to criticism from supervisors; getting along with coworkers without distracting them; maintaining socially appropriate behavior; responding appropriately to changes in the work setting; being aware of normal hazards;

-13-

and traveling in unfamiliar places and using public transportation. *Id.* at 441-442. Ms. Drollinger opined that Plaintiff would have noticeable difficulty for 11-20% of the workday or workweek in carrying out detailed instructions, and she would have noticeable difficulty for more than 20% of the workday or workweek in maintaining attention and concentration for extended periods of time, working with or in proximity to others without being distracted by them, and in setting realistic goals or making plans independently of others. *Id*. at 442. Ms. Drollinger opined that Plaintiff would not be able to perform the following tasks on a regular, reliable and sustained schedule: understanding and remembering detailed instructions; and asking simple questions or requesting assistance. *Id.* at 441-442.

Ms. Drollinger also opined that Plaintiff would be absent from work more than four days per month as a result of her impairments or treatment for her impairments. ECF Dkt. #11 at 442. Ms. Drollinger commented that Plaintiff's limitations stemmed from her high anxiety, depression and stress regarding her ongoing medical issues and being overwhelmed from taking care of her chronically ill sister. *Id*.

On January 16, 2014, Plaintiff treated with Ms. Drollinger and it was noted that her eye contact was average, her affect was appropriate, her mood was depressed, and her insight and judgment were good. ECF Dkt. #11 at 582, 724.

Plaintiff treated with Ms. Drollinger on February 3, 2014 and informed her that she had a staph infection that had left multiple open sores on her face and neck and for which she could not visit her family or go to work. ECF Dkt. #11 at 580, 722. Ms. Drollinger noted that Plaintiff had average eye contact, an appropriate affect, an anxious and euthymic mood, with good insight and judgment. *Id.* They spent the majority of the session completing Plaintiff's disability paperwork and Ms. Drollinger noted that Plaintiff had some difficulty maintaining concentration and appearing confused about questions being asked on the papers. *Id.*

February 24, 2014 progress notes by Ms. Drollinger indicate that Plaintiff reported that she was doing better although she was more overwhelmed because she was caring for her sister. ECF Dkt. #11 at 720. She reported that talking to her best friend about her feelings and getting an outside

perspective really helped her. *Id.* Ms. Drollinger noted that Plaintiff had average eye contact, an appropriate affect, a depressed and euthymic mood, with good insight and judgment. *Id.*

Progress notes from Ms. Drollinger indicate that on March 19, 2014, Plaintiff reported increasing anxiety after receiving a denial of her initial disability claim and another staph infection. ECF Dkt. #11 at 718. Her eye contact was average, her affect was appropriate, her mood was depressed, and her insight and judgment were good. *Id.*

April 14, 2014 progress notes from Portage Path indicate that Plaintiff presented and reported that things were going okay and she was taking advantage of the weather by being more active. ECF Dkt. #11 at 716. Ms. Drollinger noted that Plaintiff's eye contact was average, her mood was anxious and euthymic, her affect was appropriate and her insight and judgment were good. *Id.*

On April 21, 2014, Dr. Rosenthal, Ph.D. performed a psychological examination of Plaintiff for the agency. ECF Dkt. #11 at 688. Plaintiff reported that her obstacle to working was her fibromyalgia and pain. *Id.* When prompted about non-physical limitations, Plaintiff said that she had trouble focusing and concentrating, but her mood was okay. *Id.* Plaintiff informed Dr. Rosenthal that she currently worked part-time as a florist at a flower shop and had the job for the past four years as it was the "only thing I can go to without feeling stress and confusion." *Id.* at 689. She explained that she received treatment at Portage Path for the last year and sought treatment because she was overwhelmed and "had a meltdown" after she went off of antidepressants previously prescribed to her because she could not afford them. *Id.* She indicated that counseling was helpful and her sister's death was a trigger to her depression. *Id.* She also reported panic attacks, although she had not had any attacks over the past 6-8 months. *Id.*

Plaintiff reported that she performs household chores when physically able and she has no difficulty driving. ECF Dkt. #11 at 689. She has difficulty sleeping when she does not take her medication, but when she does, she sleeps from 9-9:30 pm to 6-6:30 am. *Id.* She makes her own breakfast and helps her sister get her breakfast, and she spends her days talking with her sister, watching television, reading and visiting with her grandchildren. *Id.* She reported having no trouble going grocery shopping, as long as she has a list, as she will get stuck in an aisle without one, and she has some difficulty staying focused while reading or sitting still while watching television. *Id.*

She reported feeling very anxious, shaky and nervous a few times per week, but she can be distracted from the worry. *Id*. Plaintiff also indicated that she feels sad sometimes when she thinks about what she used to be able to do and her current money troubles. *Id.* at 689-690. She explained that working at the flower shop is like therapy to her. *Id.* at 690.

Dr. Rosenthal's examination of Plaintiff indicated that Plaintiff was tearful throughout the interview and her thoughts were logical and coherent, with a dysthymic affect, and no symptoms of anxiety. ECF Dkt. #11 at 690. Her recall testing showed low average to average results and she responded well to instructions. *Id*. at 690-691. Testing also revealed low average attention and concentration, although conversation showed that Plaintiff followed the flow of the conversation and was not distracted. *Id*. at 691. Dr. Rosenthal diagnosed Plaintiff with depressive disorder with anxiety, and she opined that Plaintiff could understand, remember and complete task instructions in a work environment, she could maintain attention, pace and persistence to complete tasks in such an environment, she could respond appropriately to supervisors and co-workers, and she could respond appropriately to work pressures in a work setting. *Id.*

Progress notes dated May 12, 2014 indicate that Plaintiff presented to Ms. Drollinger reporting that she had a good but busy Mother's Day where she worked at the flower shop and spent time with her family. ECF Dkt. #11 at 714. She indicated that she paid for the activities as her fibromyalgia pain, along with swelling all over her body, had her in tears. *Id*. She was worried that she had congestive heart failure like her sisters because of all of the swelling. *Id.* Ms. Drollinger noted that Plaintiff had average eye contact, appropriate affect and depressed and euthymic mood, and good insight and judgment. *Id.* They discussed her anxiety regarding getting tested for congestive heart failure due to her sister's death and her other sister's diagnosis. *Id.* at 715.

June 9, 2014 progress notes indicate that Plaintiff reported that things were going better as her fibromyalgia medications were being switched, her EKG came back normal, and she had a long talk with her mother which resolved some underlying issues. ECF Dkt. #11 at 712. Ms. Drollinger noted that Plaintiff's eye contact was average, her affect was appropriate, her mood was euthymic and her insight and judgment were good. *Id.* She indicated that Plaintiff had a new sense of

empowerment and felt positive about her family dynamics and her new ability to see things more clearly.  *Id.* at 713.

July 7, 2014 progress notes from Ms. Drollinger indicate that Plaintiff brought her a candle to express her appreciation for her treatment.  ECF Dkt. #11 at 753.  Plaintiff reported that things were going well although her fibromyalgia symptoms had worsened.  ECF Dkt. #11 at 753.  She reported that she went to the emergency room because her ankles were so swollen that she could not bend her legs.  *Id.*  She also indicated that her insurance denied paying for her Cymbalta and she had been off of her medications for the last month.  *Id.*  Ms. Drollinger noted that Plaintiff's affect was appropriate, her mood was euthymic and anxious, and her insight and judgment were good.  *Id.*

Progress notes from Ms. Drollinger dated August 18, 2014 indicate that Plaintiff reported that things were going better because she was able to change her insurance and was hoping to see her doctor soon in order to get her medications.  ECF Dkt. #11 at 750.  She reported that she was having frustration because her mom was repeatedly asking her to help out other family members when she had enough to do caring for her sister and watching her grandchildren.  *Id.*  She was grateful that hospice was coming to evaluate her sister in order to determine if services were available to help with her.  *Id.*  Ms. Drollinger noted that Plaintiff's affect was appropriate, her mood was euthymic and her insight and judgment were good.  *Id.*

September17, 2014 progress notes from Ms. Drollinger indicate that Plaintiff reported that she was okay and had finally gotten her insurance so that she could get the Gabapentin for her fibromyalgia pain.  ECF Dkt. #11 at 748.  She reported that she was having increased anxiety based upon different professionals telling her how to take the Gabapentin.  *Id.*  Ms. Drollinger noted that Plaintiff's affect was appropriate, her mood was euthymic and anxious and her insight and judgment were good.  *Id.*

Progress notes from Ms. Drollinger dated October 15, 2014 indicate that Plaintiff reported that she was doing okay but had pain from having a tooth pulled and from her fibromyalgia.  ECF Dkt. #11 at 746. Ms. Drollinger noted that Plaintiff's affect was appropriate, her mood was euthymic and her insight and judgment were good.  *Id.*

November 17, 2014 progress notes from Ms. Drollinger indicate that Plaintiff reported that her rheumatologist had just told her that she had arthritis in her hands for which she can just take Aleve twice per day and follow up once a year. ECF Dkt. #11 at 744. She reported that she was having more pain from her fibromyalgia due to the cold temperatures and she was using breathing/relaxation techniques and mindfulness to help with her anxiety. *Id*. Ms. Drollinger noted that Plaintiff's affect was appropriate, her mood was euthymic and her insight and judgment were good. *Id*.

December 15, 2014 progress notes from Ms. Drollinger indicate that Plaintiff reported that things were going "pretty good" despite some swelling she experienced from fibromyalgia. ECF Dkt. #11 at 742. She reported that she was dog sitting for her daughter and working a couple days per week at the flower shop. *Id*. Ms. Drollinger noted that Plaintiff's affect was appropriate, her mood was anxious and euthymic and her insight and judgment were good. *Id*.

Ms. Drollinger's February 18, 2015 progress notes indicate that Plaintiff reported that things were going okay, but she continued to battle fibromyalgia flare-ups and she had painful swelling in her hands from working almost 34 hours in the flower shop during the week before Valentine's Day. ECF Dkt. #11 at 793. Ms. Drollinger noted that Plaintiff's eye contact was average, her affect was appropriate, her mood was anxious and euthymic and her insight and judgment were good. *Id*.

Notes dated April 20, 2015 from Ms. Drollinger indicate that Plaintiff reported that things were okay, but her anxiety was high because her 95 year-old mother fell and broke two bones in her hip a few months prior. ECF Dkt. #11 at 790. Ms. Drollinger noted that Plaintiff's affect was appropriate, her mood was anxious and depressed and her insight was good and her judgment was fair. *Id*.

June 29, 2015 progress notes show that Plaintiff presented reporting that she was really busy cleaning out her mother's house in order to prepare for her mother's return home from rehabilitation. ECF Dkt. #11 at 787. Ms. Drollinger noted that Plaintiff's affect was appropriate, her mood was euthymic, and her insight and judgment were good. *Id.*

## VI.    RELEVANT TESTIMONIAL EVIDENCE

Plaintiff testified at the time of the ALJ hearing that she was born in 1958 and had a high school diploma and a driver's license. ECF Dkt. #11 at 39.  She testified that she lives at her sister's house with her sister and brother-in-law.  *Id*. at 40.

She explained that she is unable to work because of fibromyalgia.  ECF Dkt. #11 at 41. Plaintiff reported that Dr. Enders was treating her but now Dr. Krebs was treating her as Dr. Enders left the practice.  *Id.*  She explained that she was on medication for the condition and she used biofreeze and heat or ice.  *Id*.  She testified that her symptoms include back spasms, arm numbness, and her shoulder swelling, and she drops things, and she has memory loss, fatigue, digestive disorders, nervousness, anxiety and depression.  *Id.*  Plaintiff reported that the medication for the most part worked "okay" in handling her symptoms*. Id.*

Plaintiff indicated that she was working part-time as a florist 10 to 20 hours per week and she could perform this job because it was low-stress, but she could not perform it on a full-time basis because working full-time makes her body "hurt really bad." ECF Dkt. #11 at 43.  She reported that she exercises and tries to move around.  *Id.*  She also testified that she works 3-4 days a week at the florist and works consecutive days, which are rough in the mornings for her because she is stiff and her body aches.  *Id*. at 44.

Plaintiff testified that on typical days when she does not work, she paces herself and microwaves her meals because she is a terrible cook, and she does her own laundry, lightly cleans the house, and goes to the store by herself. ECF Dkt. #11 at 45.  She stopped babysitting her grandchildren six weeks prior and she sometimes sweeps her mother's house.  *Id*. at 45-46.  When asked if she still cared for her sister, she reported that she never really took care of her as she would just open the door for her sister's nurse or give her sister her medications.  *Id*. at 46.  When asked about the times that she told her counselor that she was overwhelmed by how much she had to do for her sister, she explained that it was overwhelming to watch this sister be diagnosed with the same diagnosis with which her other sister had passed away.  *Id*.

Upon questioning from her attorney, Plaintiff indicated that when she was cleaning out her mother's house, she was not doing it alone as her niece was helping her.  ECF Dkt. #11 at 46. She

-19-

testified that she could not have done it by herself.  *Id*. She also noted that on the days that she worked, she could not help clean out her mother's house.  *Id.* at 47.  She indicated that she dropped things all of the time, even at work, because her hands go numb all the way up to under her arms. *Id*. at 47-48.  She noted that the maximum number of hours that she worked in a day was 6 hours, which was unusual and the usual number of hours was 4.5 to 6 hours or 6.5 hours per day, approximately 3 days per week.  *Id*. at 48.  She said that consecutive days of work leave her feeling very sore and achy and she could work only up to three days in a row before she would have to take a day off.  *Id.* at 49.

As to medical records indicating that Plaintiff had colon and lung cancer, Plaintiff testified that she did not have those conditions and if she did, she did not remember having them.  ECF Dkt. #11 at 49. Plaintiff reported that she has trouble with her legs and feet swelling, she had a TIA before, and she had trouble with diarrhea in the past.  ECF Dkt. #11 at 52.

Upon questioning from the ALJ, Plaintiff indicated that she used to work as a bank teller but was laid off because the economy was bad.  ECF Dkt. #11 at 53.

The VE then testified. ECF Dkt. #11 at 53.  The ALJ asked the VE to assume a hypothetical person with the same age, education and work experience as Plaintiff who can lift, carry, push and pull 20 pounds occasionally and 10 pounds frequently; sitting and standing/walking up to 6 hours per normal workday; occasional kneeling and crawling; never climbing ladders, ropes or scaffolds; avoiding workplace hazards such as unprotected heights or exposure to dangerous moving machinery.  *Id.* at 55.  The VE responded that such a hypothetical person could perform Plaintiff's past relevant work as a bank teller.  *Id.*

The ALJ added limitations that the first hypothetical person was limited to simple, routine tasks that do not involve arbitration, negotiation or confrontation; no directing the work of others or being responsible for the safety/welfare of others; and no performance of piece rate work or assembly line work.  ECF Dkt. #11 at 56.  The VE responded that the bank teller job would not be available for this hypothetical individual, even if the exertional level was changed to sedentary work. *Id.*

Plaintiff's counsel asked the VE about jobs available for the ALJ's first hypothetical person if the hypothetical person could only work no more than 3 days in a row and would then need to be off a day.  ECF Dkt. #11 at 57.  The VE responded that the bank teller job would be available for such a hypothetical individual if that person could work 3 days in a row, then have a day off, then return to work.  *Id.*  However, the VE responded that the bank teller job would not be available if the hypothetical person could work no more than 6.5 hours per day.  *Id.*  The VE responded the same when Plaintiff's counsel added limitations of the ability to understand and remember only short and simple instructions or if the person could lift no more than 8 pounds for 1/3 of the workday.  *Id.* at 58.

**VII.**   **LAW AND ANALYSIS**

   **A.**   **STEP TWO FINDING BY ALJ**

Plaintiff first asserts that the ALJ failed to articulate a valid reason for finding that her depression and anxiety were not severe impairments at Step Two of the sequential evaluation for determining entitlement to social security benefits.  ECF Dkt. #14 at 5-10.

At step two of the sequential steps for evaluating entitlement to social security benefits, a claimant must show that he or she suffers from a severe medically determinable physical or mental impairment. 20 C.F.R. § 404.1520(a)(4)(ii). An impairment is not considered severe when it "does not significantly limit [one's] physical or mental ability to do basic work activities." §404.1521(a).

At step two, the term "significantly" is liberally construed in favor of the claimant.  The regulations provide that if the claimant's degree of limitation is none or mild, the Commissioner will generally conclude the impairment is not severe, "unless the evidence otherwise indicates that there is more than a minimal limitation in your ability to do basic work activities." 20 C.F.R. §404.1520a(d).  The purpose of the second step of the sequential analysis is to enable the Commissioner to screen out "totally groundless claims."  *Farris v. Sec'y of HHS*, 773 F.2d 85, 89 (6th Cir.1985).  The Sixth Circuit has construed the step two severity regulation as a "*de minimis* hurdle" in the disability determination process.  *Higgs v. Bowen*, 880 F.2d 860, 862 (6th Cir.1988).

Under a Social Security policy ruling, if an impairment has "more than a minimal effect" on the claimant's ability to do basic work activities, the ALJ is required to treat it as "severe." SSR 96-3p (July 2, 1996).

Once the ALJ determines that a claimant suffers a severe impairment at step two, the analysis proceeds to step three; any failure to identify other impairments, or combinations of impairments, as severe in step two is harmless error. *Maziarz v. Sec'y of Health & Human Servs.*, 837 F.2d 240, 244 (6th Cir.1987). Once a claimant clears Step Two of the sequential analysis, the ALJ is required to consider all of his or her impairments, severe and non-severe, at every subsequent step of the sequential evaluation process. *See Anthony v. Astrue*, 266 Fed. App'x 451, 457 (6ᵗʰ Cir. 2008)(ALJ's failure to identify an impairment as severe was "legally irrelevant" because the ALJ found other impairments to be severe at Step Two, which allowed ALJ to consider all impairments in the later steps in the process).

In the instant case, the ALJ conducted a thorough analysis of Plaintiff's mental health impairments and adequately explained his reasons for finding that they were not severe at Step Two. Tr. at 21-22. The ALJ properly noted that Ms. Drollinger, Plaintiff's counselor, was not an acceptable medical source. *Id.* at 22; *see* 20 C.F.R. §§404.1502(a)[3], 416.902(a), 404.1513(d), 416.913(d). The ALJ went on to consider Ms. Drollinger's opinion that Plaintiff was moderately to markedly limited in her mental functioning. *Id.* He reasoned that if Plaintiff was as severely limited as Ms. Drollinger opined, she would not be able work as a florist, babysit her grandchildren, and care for her sister as she reported that she did. *Id.* Plaintiff interprets a sentence in this part of the ALJ's decision to mean that the ALJ attributed Plaintiff's depression and anxiety to her medical issues and her being overwhelmed in acting as primary caretaker for her ill sister. ECF Dkt. #14 at 15. However, the ALJ did not find make such a finding. ECF Dkt. #11 at 21-22. Rather, he stated that *if Plaintiff was as limited as Ms. Drollinger's opined* "from high anxiety, depression, & stress related ongoing medical issues & being overwhelmed as a primary caretaker for chronically ill

---

[3] While the scope of who is an "acceptable medical source" has been broadened effective March 17, 2017 under the Social Security regulations, Ms. Drollinger's PC-CR status is not included. *See* 20 C.F.R. §§ 404.1502(a), 416.902(a).

sister," *she would not be able to perform the activities that she was performing*, such as working as a florist, babysitting her grandchildren, and caring for her ill sister. *Id.*

In addition, the ALJ adequately articulated and supported his analysis of the four functional areas and cited to some of Ms. Drollinger's progress notes and other facts and medical reports in the record which helped lead him to conclude that Plaintiff was only minimally limited in the four areas. ECF Dkt. #11 at 22. For instance, he cited to Ms. Drollinger's finding that Plaintiff had concentration, attention and memory deficits, yet he cited to her notes and reports that Plaintiff indicated that she read a book in its entirety in three days and she was able to care for her ill sister, which involved providing her with reminders to perform everyday tasks. *Id.* at 22, citing ECF Dkt. #11 at 442 and ECF Dkt. #11 at 445.  He also noted that Plaintiff was able to care for herself, her ill sister, and her grandchildren, dog sit, and she consistently works as a florist, she washes clothes and dishes, performs household chores, drives a car and shops.  *Id.* at 22, citing ECF Dkt. #11 at 288, 750, 799, 814. From these facts, the ALJ properly concluded that Plaintiff had only minimal limitation in her daily living activities. *Id.*  As to social functioning, the ALJ found no limitations as Plaintiff indicated that she got along well with family and friends and she visited frequently with them.  *Id*. at 22, citing ECF Dkt. #11 at 290, 454,  578.  Besides the abilities to work as a florist, read a book in three days and to provide reminders for her sister to perform everyday tasks, the ALJ also found that Plaintiff was able to attend to her personal care and medications, all of which supported only minimal limitations in the areas of concentration, persistence or pace.  *Id*. at 22, citing ECF Dkt. #11 at 287-288, 290, 445.  Finally, as to episodes of deterioration or decompensation, the ALJ noted that none had been reported.  *Id*. at 23.

While Plaintiff cites to her diagnoses of moderate major depressive disorder and generalized anxiety disorder, diagnoses alone do not establish severity. *Higgs v. Bowen*, 880 F.2d 860, 863 (6th Cir. 1988).  Similarly, the facts that Plaintiff took medications and attended counseling do not establish that she was more than minimally limited in her ability to do basic work activities. In addition, while Plaintiff points to the 2012 initial assessment at Portage Path of a GAF of 53, indicative of moderate symptoms or difficulty in functioning, no GAFs were assigned at any other point at Portage Path. ECF Dkt. #14 at 14.  The ALJ noted the lack of additional GAFs.  ECF Dkt.

#11 at 22.  The ALJ also referenced notes and reports in which Plaintiff states that she is incredibly busy, which is inconsistent with a finding that she is more than mildly limited. ECF Dkt. #11 at 22, citing ECF Dkt. #11 at 45-46, 714, 742, 750, 787.  He also noted Plaintiff's reports that counseling and her medications were effective.  ECF Dkt. #11 at 22, citing ECF Dkt. #11 at 445, 742, 689.

Plaintiff also cites to Dr. Rosenthal's statement that Plaintiff's report of decreased cognitive functioning following the "mini-stroke" that she sustained.  ECF Dkt. #14 at 15.  However, as noted by Dr. Rosenthal, Plaintiff reported no significant impairment in attention and concentration or in interpersonal issues.  ECF Dkt. #11 at 690.  And the basis of Plaintiff's cognitive changes do not establish on their own that her mental conditions are severe.  Moreover, Dr. Rosenthal nevertheless found that Plaintiff was not significantly limited or no more than mildly limited in understanding, remembering or carrying out instructions, social functioning, maintaining attention and concentration, and responding to changes in the work setting.  ECF Dkt. #11 at 22, citing ECF Dkt. #11 at 690-691.  The ALJ gave great weight to this opinion.  ECF Dkt. #11 at 22.  The ALJ also gave great weight to the opinion of Dr. Finnerty, the state agency reviewing psychologist, who found that Plaintiff's mental impairments were not severe as she was able to perform her daily living activities, she drive, shopped and visited with others, she did not require significant support from the community, and she worked part-time as a florist.  *Id.*, citing ECF Dkt. #11 at 110.

Accordingly, the undersigned recommends that the Court find that the ALJ has adequately explained his determination that Plaintiff's mental impairments were not severe under Step Two and substantial evidence supports his determination.

Plaintiff also raises in one sentence that the ALJ erred by failing to mention her July 2015 diagnosis of carpal tunnel syndrome, Stage I left ventricular dysfunction, and developing problems with her knee.  ECF Dkt. #14 at 15.  Beyond citing to records showing that Plaintiff had diagnoses of carpal tunnel syndrome and Stage I left ventricular dysfunction, the records lack any information concerning their severity and Plaintiff otherwise fails to develop any argument as to how these impairments are severe and restrict her in any way.

Plaintiff also raises in one sentence that the ALJ failed to review all of the criteria under Social Security Rule 12-2p in evaluating her fibromyalgia.  ECF Dkt. #14 at 15.  Again, however,

-24-

Plaintiff fails to present any argument as to the ALJ's alleged omissions. The ALJ found that Plaintiff's fibromyalgia was a severe impairment and he provided restrictions based upon his evaluation of the medical records and non-medical records in the file. Without more facts and law provided by Plaintiff, the Court should find that Plaintiff has waived this assertion. *See McPherson v. Kelsey*, 125 F.3d 989, 995-996 (6ᵗʰ Cir. 1997)("Issues adverted in a perfunctory manner, unaccompanied by some effort at developed argumentation, are deemed waived. It is not sufficient for a party to mention a possible argument in the most skeletal way, leaving the court to put flesh on its bones.") (internal quotation marks and citations omitted)); *Hollon v. Comm'r of Soc. Sec.*, 447 F.3d 477, 490-491 (6ᵗʰ Cir. 2006)("This challenge warrants little discussion, as Hollon has made little effort to develop this argument in her brief on appeal, or to identify any specific aspects of the Commissioner's determination that lack support in the record.").

Based upon the above, the undersigned recommends that the Court find that the ALJ properly articulated the bases for his finding that Plaintiff's mental impairments were not severe and substantial evidence supports that determination.

### B.  TREATING COUNSELOR AND TREATING PHYSICIAN OPINIONS

Plaintiff also asserts that the ALJ violated the treating physician rule by failing to give valid reasons for rejecting and not giving great weight to the opinions of Ms. Drollinger, Plaintiff's treating counselor, and Dr. Vitarella, Plaintiff's treating physician. ECF Dkt. #14 at 16-19.

An ALJ must give controlling weight to the opinion of a treating source[4] if the ALJ finds that the opinion is well-supported by medically acceptable clinical and diagnostic techniques and not inconsistent with the other substantial evidence in the record. *Wilson v. Comm'r of Soc. Sec.*, 378 F.3d 541, 544 (6ᵗʰ Cir. 2004). If an ALJ decides to discount or reject a treating physician's opinion, he must provide "good reasons" for doing so. Social Security Rule ("SSR") 96-2p. The ALJ must provide reasons that are "sufficiently specific to make clear to any subsequent reviewers the weight the adjudicator gave to the treating source's medical opinion and the reasons for that weight." *Id.*

---

[4]  The Court notes that the SSA has changed the treating physician rule effective March 27, 2017. The SSA will no longer give any specific evidentiary weight to medical opinions, including affording controlling weight to medical opinions. Rather, the SSA will consider the persuasiveness of medical opinions using the factors specified in their rules and will consider the supportability and consistency factors as the most important factors.

This allows a claimant to understand how her case is determined, especially when she knows that her treating physician has deemed her disabled and she may therefore "be bewildered when told by an administrative bureaucracy that [s]he is not, unless some reason for the agency's decision is supplied." *Wilson,* 378 F.3d at 544 (quoting *Snell v. Apfel*, 177 F.3d 128, 134 (2d Cir. 1999)). Further, it "ensures that the ALJ applies the treating physician rule and permits meaningful appellate review of the ALJ's application of the rule." *Id.* If an ALJ fails to explain why he rejected or discounted the opinions and how those reasons affected the weight afforded to the opinions, this Court must find that substantial evidence is lacking, "even where the conclusion of the ALJ may be justified based upon the record." *Rogers,* 486 F.3d at 243 (citing *Wilson*, 378 F.3d at 544).

The Sixth Circuit has noted that, "while it is true that a lack of compatibility with other record evidence is germane to the weight of a treating physician's opinion, an ALJ cannot simply invoke the criteria set forth in the regulations if doing so would not be 'sufficiently specific' to meet the goals of the 'good reason' rule." *Friend v. Comm'r of Soc. Sec.*, No. 09-3889, 2010 WL 1725066, at *8 (6th Cir. 2010). The Sixth Circuit has held that an ALJ's failure to identify the reasons for discounting opinions, "and for explaining precisely how those reasons affected the weight" given "denotes a lack of substantial evidence, even where the conclusion of the ALJ may be justified based upon the record." *Parks v. Social Sec. Admin.*, No. 09-6437, 2011 WL 867214, at *7 (6th Cir. 2011) (quoting *Rogers*, 486 F.3d at 243 ). However, an ALJ need not discuss every piece of evidence in the administrative record so long as he considers all of a claimant's medically determinable impairments and the opinion is supported by substantial evidence. *See* 20 C.F.R. § 404.1545(a)(2); *see also Thacker v. Comm'r of Soc. Sec.*, 99 F. App'x 661, 665 (6th Cir. 2004). Substantial evidence can be "less than a preponderance," but must be adequate for a reasonable mind to accept the ALJ's conclusion. *Kyle v. Comm'r of Soc. Sec.*, 609 F.3d 847, 854 (6th Cir. 2010) (citation omitted).

If an ALJ declines to give controlling weight to the opinion of a treating source, he must determine the weight to give that opinion based upon a number of regulatory factors. 20 C.F.R. § 404.1527(c)(2). Such factors include "the length of the treatment relationship and the frequency of examination, the nature and extent of the treatment relationship, supportability of the opinion,

consistency of the opinion with the record as a whole, and the specialization of the treating source." *Wilson*, 378 F.3d at 544, citing 20 C.F.R. § 404.1527(c).  An ALJ is not required to discuss every factor in 20 C.F.R. § 404.1527(c).

### 1. Ms. Drollinger-Treating Counselor

The undersigned recommends that the Court find that the ALJ more than sufficiently explained his reasons for the weight that he attributed to Ms. Drollinger's opinion and said reasons are valid and supported by substantial evidence.  The ALJ reviewed and addressed Ms. Drollinger's opinions in his decision.  ECF Dkt. #11 at 22.  He explained that Ms. Drollinger was not an acceptable medical source.  *Id.*  The ALJ is correct that Ms. Drollinger is not an acceptable medical source under the Social Security regulations. *See* 20 C.F.R. §§404.1502(a), 416.902(a), 404.1513(d), 416.913(d).  As required by the regulations, the ALJ considered Ms. Drollinger's opinion and found it inconsistent with her own progress notes and unsupported by the rest of the record.  ECF Dkt. #11 at 22.  The ALJ reasoned that if Plaintiff was as severely limited as Ms. Drollinger opined due to her mental impairments, Plaintiff would not be able to perform all of the activities that she reported, such as caring for her ill sister, babysitting her grandchildren, caring for herself, and working part-time as a florist.  *Id.* The ALJ further noted that while Ms. Drollinger opined that Plaintiff's concentration, memory and attention were limited, Ms. Drollinger's progress notes indicated that Plaintiff reported reading a book in its entirety in three days and caring for her sister, which required her to remind her sister to perform everyday tasks.  *Id.*  The ALJ also noted that the Portage Path records were vague and did not contain GAFs except for upon Plaintiff's initial assessment.  *Id.*  The records from Portage Path are somewhat vague and are internally inconsistent with Ms. Drollinger's restrictive opinion because they record Plaintiff's reports of performing numerous mental and physical daily activities and make relatively normal clinical findings of fair to good insight and judgment, appropriate affect, depressed, euthymic and/or anxious mood, and fair to average eye contact . *Id.* at 580, 582, 584, 586, 589, 591, 595, 597, 599, 601, 603, 606, 611, 712, 714, 716, 718, 720, 722, 724, 787, 790, 793.  The progress notes record Plaintiff's reports to Ms. Drollinger of her numerous activities, including working, caring for her ill sister, helping her sister to remember to perform everyday tasks, reading an entire book in three days, and cleaning out her mother's house.

-27-

*Id*. at 586, 591, 595, 601, 606, 611, 787, 790, 793.  These activities belie Ms. Drollinger's reports of severe limitations for Plaintiff, as found by the ALJ.  The ALJ also relied upon the opinion of Dr. Rosenthal, the agency consulting psychologist, who opined that Plaintiff was no more than mildly limited in performing her daily living activities, sustaining concentration, persistence and pace, social functioning, and responding to changes in the workplace.  *Id*.  He also cited to the state agency mental health reviewing source opinions who found that Plaintiff was no more than mildly limited in some areas of functioning.  *Id.*  The ALJ explained that these opinions were consistent with Plaintiff's reports of her numerous daily activities, which included her statements that she was incredibly busy and had a lot on her plate and she was able to work as a florist in addition to all of the other activities that she was performing on a daily basis. *Id.*

The undersigned recommends that the Court find that based upon the above, the ALJ provided valid reasons for attributing little weight to Ms. Drollinger's opinion and substantial evidence supports his decision to do so.

**2.  Dr. Vitarella-Treating Physician**

Plaintiff also asserts that the ALJ failed to provide good reasons for attributing less than controlling weight to Dr. Vitarella's opinion because Dr. Vitarella found that Plaintiff could lift and carry only up to 8 pounds no more than 1/3 of the workday and she opined that Plaintiff would need additional breaks throughout the workday and would be absent about two days per month due to her fibromyalgia.  ECF Dkt. #14 at 17.  Plaintiff asserts that Dr. Vitarella examined Plaintiff numerous times and noted her problems with fibromyalgia and TIA and her depression with anxiety.  *Id.* at 17.  Plaintiff concludes the ALJ was bound to afford Dr. Vitarella's opinion controlling weight because it was not inconsistent with her progress notes and findings and no evidence in the record contradicted this treating source.  *Id.* at 17-18.

The undersigned recommends that the Court find that the ALJ provided good reasons for affording less than controlling weight to Dr. Vitarella's opinion and adequately provided support for his decision to attribute little weight to her opinion.  The ALJ found that Plaintiff's fibromyalgia was a severe impairment and he limited her to light work with occasional kneeling and crawling, no climbing of ladders, ropes, or scaffolds, and no exposure to workplace hazards, such as

unprotected heights and dangerous moving machinery. ECF Dkt. #11 at 23.  He acknowledged that Dr. Vitarella was Plaintiff's treating physician, but he afforded little weight to her opinion that Plaintiff could lift and carry up to 8 pounds 1/3 of the workday, could only occasionally perform any postural activities, had to avoid temperature extremes, would be absent about 2 days per month due to pain or fatigue, and would be off-task 10% of the workday.  *Id*. at 24, citing ECF Dkt. #11 at 627-628.

In deciding to afford less than controlling weight and only little weight to Dr. Vitarella's opinion, the ALJ acknowledged that the record "undoubtedly" demonstrated an ongoing diagnosis of fibromyalgia. ECF Dkt. #11 at 25.  He also found Plaintiff's complaints of pain and fatigue to have some credibility.  *Id*.  He further noted Plaintiff's two flares with pitting edema and increased joint pain, but he also noted relatively benign findings upon physical examination.  *Id*.  Had the ALJ only relied upon the relatively benign clinical findings, an issue would arise concerning the ALJ's treatment of Dr. Vitarella's opinion and his RFC determination because fibromyalgia is not amenable to objective diagnosis and standard clinical tests are "not highly relevant" in diagnosing or assessing fibromyalgia or its severity. *Preston v. Sec'y of Health and Human Servs.*, 854 F.2d 815, 820 (6th Cir. 1988); *see also Rogers v. Comm'r of Soc. Sec.,* 486 F.3d 234, 243-244 (6th Cir. 2007)("in light of the unique evidentiary difficulties associated with the diagnosis and treatment of fibromyalgia, opinions that focus solely upon objective evidence are not particularly relevant"). Those who suffer from fibromyalgia "manifest normal muscle strength and neurological reactions and have a full range of motion." *Rogers*, 486 F.3d at 244 (quoting *Preston*, 854 F.2d at 820).

However, the ALJ provided a lengthy review of his reasons for his treatment of Dr. Vitarella's opinion. He found that the record did not support less than sedentary exertion as Dr. Vitarella found. ECF Dkt. #11 at 24. He cited to the progress note from Dr. Vitarella that while Plaintiff's fibromyalgia symptoms were still present "despite medications." However, he also cited to Plaintiff's testimony and a number of progress notes where she reported that her symptoms "significantly improved" with medications such as anti-inflammatories, muscle relaxers and analgesics and she admitted to less stiffness and joint pain with improved ability to function and sleep. *Id.* at 24, citing ECF Dkt. #11 at 41 (When asked by ALJ how effective her medications were

-29-

in handling her fibromyalgia symptoms, she responded "[f]or the most part, I think okay."); 488 (6/10/13 progress note indicating improved symptoms of functionality, insomnia, joint pain, joint stiffness, with NSAID and Flexeril); 702 (6/4/14 progress note indicating Plaintiff's report that her fibromyalgia had improved); 732 (10/15/14 progress note indicating Plaintiff's report that fibromyalgia was better).

In addition to the progress notes and Plaintiff's testimony concerning the effectiveness of her medications, the ALJ cited to the number of daily activities that she performed, which he concluded also belied Dr. Vitarella's severe limitations for Plaintiff. ECF Dkt. #11 at 24. The ALJ cited to Plaintiff's continued work as a florist for several years which showed part-time work of 10-20 hours per week with instances of Plaintiff working 30 hours or more in a week. *Id.*, citing ECF Dkt. #11 at 43, 689, 742, 793. The ALJ also cited to Plaintiff's ability to care for her personal needs and her ability to drive and do some housework, including laundry and making her bed, vacuuming and doing dishes. *Id.* at 24, citing ECF Dkt. #11 at 287-288, 689, 712. He also referred to reports that she cared for her ill sister, cared for her daughter's dog, and cared for her grandchildren by babysitting them and picking them up from school. *Id.* at 24, citing ECF Dkt. #11 at 287-288, 712, 742. He also cited to Plaintiff's reports that she spent a few months cleaning out her mother's home with her niece. *Id.* at 24, citing ECF Dkt. #11 at 787, 799. He further cited to her report that she walks 1.8 miles to work. *Id.* at 24, citing ECF Dkt. #11 at 291.

Upon explaining his reasons for attributing less than controlling and only little weight to Dr. Vitarella's opinion, the ALJ cited to the opinions of the state agency physicians, who opined that Plaintiff could lift up to 50 pounds occasionally and 25 pounds frequently, she could sit, stand/walk up to 6 hours per 8-hour workday, and she could occasionally climb ladders, ropes or scaffolds. ECF Dkt. #11 at 25, citing ECF Dkt. #11 at 87 , 96, 112, 127. He attributed only some weight to those opinions, finding that Plaintiff's testimony and the consistency of her pain and fatigue warranted a reduction to light exertional work. *Id.* at 25.

Based upon the ALJ's decision as reviewed above and the record, the undersigned recommends that the Court find that the ALJ has provided good reasons for affording less than controlling weight and has reviewed the appropriate regulatory factors and articulated valid reasons

-30-

for attributing only little weight to Dr. Vitarellla's opinion and substantial evidence supports his decision to do so.

### C.    **CREDIBILITY**

Plaintiff also challenges the ALJ's credibility determination, asserting generically that the ALJ did not properly evaluate the medical evidence and determine whether her testimony was credible. ECF Dkt. #14 at 19. Plaintiff maintains that the ALJ's "brief and vague" explanation of finding her less than fully credible provided no basis for determining that she could return to her past relevant work as a bank teller. *Id.* at 20. She cites to a counseling session, a physical examination, and a consultative examination in which it was noted that she was having trouble with her memory and concentration. *Id.*, citing ECF Dkt. #11 at 445, 690, 730.

The social security regulations establish a two-step process for evaluating pain. *See* 20 C.F.R. §§ 404.1529, 416.929, SSR 96–7p, (superseded by SSR 16-3p, effective March 28, 2016). In order for pain or other subjective complaints to be considered disabling, there must be (1) objective medical evidence of an underlying medical condition, and (2) objective medical evidence that confirms the severity of the alleged disabling pain arising from that condition, or objectively, the medical condition is of such severity that it can reasonably be expected to produce such disabling pain. *See id.*; *Stanley v. Sec'y of Health & Human Servs.*, 39 F.3d 115, 117 (6th Cir.1994); *Felisky v. Bowen*, 35 F.3d 1027, 1038–1039 (6th Cir.1994); *Duncan v. Sec'y of Health & Human Servs.*, 801 F.2d 847, 853 (6th Cir.1986). Therefore, the ALJ must first consider whether an underlying medically determinable physical or mental impairment exists that could reasonably be expected to produce the individual's pain or other symptoms. *See id.* Secondly, after an underlying physical or mental impairment is found to exist that could reasonably be expected to produce the claimant's pain or symptoms, the ALJ then determines the intensity, persistence, and limiting effects of the claimant's symptoms to determine the extent to which the symptoms limit the claimant's ability to do basic work activities. *See id.*

When a disability determination that would be fully favorable to the plaintiff cannot be made solely on the basis of the objective medical evidence, an ALJ must analyze the credibility of the plaintiff, considering the plaintiff's statements about pain or other symptoms with the rest of the

relevant evidence in the record and factors outlined in Social Security Ruling 96–7p. *See* SSR 96–7p, These factors include: the claimant's daily activities; the location, duration, frequency and intensity of the pain; precipitating and aggravating factors; the type, dosage, effectiveness and side effects of any pain medication; any treatment, other than medication, that the claimant receives or has received to relieve the pain; and the opinions and statements of the claimant's doctors. *Felisky*, 35 F.3d at 1039–40.

Since the ALJ has the opportunity to observe the claimant in person, a court reviewing the ALJ's conclusion about the claimant's credibility should accord great deference to that determination. *See Casey*, 987 F.2d at 1234. The Court is limited to "evaluating whether or not the ALJ's explanations for partially discrediting" a claimant "are reasonable and supported by substantial evidence in the record." *Sorrell v. Comm'r of Soc. Sec.*, 656 Fed. App'x 162, 173, quoting *Jones v. Comm'r of Soc. Sec.*, 336 F.3d 469, 475-476 (6th Cir.1997)(citing *Walters v. Comm'r of Soc. Sec.*, 127 F.3d 525, 531 (6th Cir. 1997)(citing *Kirk*, 667 F.2d at 538)). "Claimants challenging the ALJ's credibility determination face an uphill battle." *Daniels v. Commissioner*, 152 F. App'x 485, 488 (6th Cir.2005). Discounting credibility to a certain degree is appropriate where an ALJ finds contradictions among the medical reports, claimant's testimony, and other evidence. *See Bradley v. Secretary of Health and Human Servs.*, 862 F.2d 1224, 1227 (6th Cir.1988);

Here, the ALJ cited to the applicable regulations and Social Security Rulings in evaluating Plaintiff's credibility and he indicated that he applied them. ECF Dkt. #11 at 23. He then found that Plaintiff's impairments could reasonably be expected to produce the alleged symptoms of which she complained, but he found that her statements concerning the intensity, persistence and limiting effects of her symptoms were less than entirely credible. *Id.* at 24. He noted the inconsistencies of Plaintiff's daily activities with allegations of severe disabling pain, fatigue, and inability to concentrate, remember and maintain attention. The ALJ referred to Dr. Vitarella's findings and opinion and explained that he attributed less than controlling and only little weight to Dr. Vitarella's severely restrictive opinion because Plaintiff reported significant improvements with medications and Plaintiff's active lifestyle and activities negated such severe restrictions and a finding that Plaintiff's testimony of severe disabling fibromyalgia was fully credible. ECF Dkt. #11 at 23-25.

The ALJ also cited to Plaintiff's many daily activities, including her ability to work part-time, up to 30 hours on occasion, as a florist, to care for her ill sister, to watch her sister's dog, to care for her grandchildren and pick them up from school and play with them, to clean her mother's house for a few months, and to walk 1.8 miles to work. *Id.* at 24, citing ECF Dkt. #11 at 290, 445, 454, 688-689, 742. An ALJ may consider household and social activities of a claimant in evaluating a claimant's assertions of pain or ailments. *See Blacha v. Secretary of Health and Human Servs.*, 927 F.2d 228, 231 (6th Cir.1990); *Crisp v. Secretary of Health and Human Servs*, 790 F.2d 450, 453 (6th Cir.1986).

As to Plaintiff's memory, concentration and attention abilities, the ALJ found that Plaintiff's mental impairments were not severe at Step Two and in doing so, he found that Plaintiff had only mild limitations in these abilities. ECF Dkt. #11 at 21-22. He noted that Plaintiff reported to Ms. Drollinger problems with her memory, concentration and attention, but Ms. Drollinger's progress notes documented Plaintiff reports that she read an entire book in three days, she cared for her ill sister and had to remind her to perform everyday tasks, and Plaintiff did not need reminders or help to remember taking her own medications. *Id.* at 22, citing ECF Dkt. #11 at 287-288, 445. He also noted that while Dr. Rosenthal suggested the consideration that Plaintiff's "mini-stroke" caused some of her reported cognitive decline, Dr. Rosenthal nevertheless found that Plaintiff had low average attention and concentration and she would be expected to maintain attention, pace and persistence to complete work-related tasks. *Id.* at 22, citing ECF Dkt. #11 at 691. Moreover, the ALJ attributed great weight to the state reviewing psychologists, who also found that Plaintiff had no more than mild limitations in concentration, persistence and pace. *Id.* at 22, citing ECF Dkt. #11 at 110.

For these reasons, the undersigned recommends that the Court find that the ALJ properly applied the relevant law as to evaluating Plaintiff's credibility and adequately articulated his decision, and substantial evidence supports his determination to discount her credibility.

### D.     PAST RELEVANT WORK AND HYPOTHETICAL INDIVIDUALS

Plaintiff asserts that the ALJ also erred by improperly finding that she could return to her past relevant work as a bank teller. ECF Dkt. #14 at 20. However, again, she presents a vague

-33-

argument as to this assertion.  She first contends that the ALJ asked Plaintiff brief questions about her prior work as a bank teller and based upon "this brief exchange and lack of development in the record, the ALJ asked [the VE] the hypothetical questions."  *Id*. at 21.  She goes on to state that the VE testified that the first hypothetical individual presented by the ALJ could perform Plaintiff's past relevant work as a bank teller, but the VE stated that such a person could not perform the job of a bank teller if she was also limited to remembering and understanding short and simple instructions and could work no more than 6.5 hours per day.  *Id*.  Plaintiff then cites a Sixth Circuit case and maintains that  the ALJ failed to comply with the regulations because he failed to properly evaluate the cumulative effects of her impairments.  *Id*. at 21-22.

The undersigned believes that Plaintiff is attempting to assert that the ALJ erred by failing to present an accurate hypothetical individual to the VE because he failed to include a limitation to short and simple instructions and the inability to work more than 6.5 hours per day.  If this is Plaintiff's assertion, the undersigned recommends that the Court find that it has no merit.  It is well established that an ALJ may pose hypothetical questions to a VE with only those limitations that the ALJ accepted as credible. *Casey v. Sec'y of Health & Human Servs.,* 987 F.2d 1230, 1235 (6th Cir. 1993).  Ms. Drollinger opined the limitation to short and simple instructions in her medical source statement.  ECF Dkt. #11 at 441.  Dr. Rosenthal suggested that the possibility of a cognitive change that Plaintiff reported could stem from the "mini-stroke" that Plaintiff suffered.

However, the ALJ properly attributed only little weight to Ms. Drollinger's opinion and had substantial evidence to support this finding, and he noted that Plaintiff continuously worked as a florist and did so while performing many daily activities, such as caring for her sister and reminding her to perform her everyday tasks.  *Id.* at 22.  Moreover, the ALJ noted that Dr. Rosenthal, despite her suggestion concerning a possible cognitive change due to Plaintiff's "mini-stroke," nevertheless found that Plaintiff responded timely and appropriately to her questions without the need for repetition and followed instructions without difficulty.  *Id.* at 22, citing ECF Dkt. #11 at 691.  Dr. Rosenthal also opined that Plaintiff would be able to understand, remember and complete task instructions and she placed no limitations on Plaintiff to understanding and remembering only short and simple instructions.  *Id*. at 691.

-34-

As to the ALJ's alleged error in failing to limit Plaintiff to working no more than 6.5 hours per day, Plaintiff did testify at the ALJ hearing that she worked anywhere from 4.5 hours to 6.5 hours on the days that she works as a florist and she could not work full-time because her body would hurt too much from fibromyalgia.  ECF Dkt. #11 at 43, 48.  Her counsel asked the VE to add to the ALJ's hypothetical person the limitation that the person could work no more than 6.5 hours per day.  *Id.* at 57.  The VE responded that such a hypothetical person would be precluded from work because it is not full-time work.  *Id*. at 57-58.  However, no medical source opined such a limitation for Plaintiff and Plaintiff provides no other basis for this limitation.  Moreover, the ALJ properly discounted Plaintiff's credibility, sufficiently articulated and properly found Plaintiff's mental limitations to be non-severe,  and he properly attributed little weight to the opinion of her treating counselor.

Based upon the ALJ's decision, his proper finding that Plaintiff's mental impairments were not severe, and Plaintiff's lack of support for limitations to short and simple instructions and no more than 6.5 hours of work per day, the undersigned recommends that the Court find without merit Plaintiff's assertion that the ALJ erred by not including these limitations in his hypothetical individuals presented to the VE.

## VIII.   CONCLUSION AND RECOMMENDATION

For the foregoing reasons, the undersigned recommends that the Court AFFIRM the ALJ's decision and DISMISS Plaintiff's complaint in its entirety WITH PREJUDICE.


Date: March 5, 2018                                    */s/George J. Limbert*
                                                       GEORGE J. LIMBERT
                                                       UNITED STATES MAGISTRATE JUDGE


ANY OBJECTIONS to this Report and Recommendation must be filed with the Clerk of Court within fourteen (14) days of service of this notice.  Fed. R. Civ. P. 72; L.R. 72.3.  Failure to file objections within the specified time WAIVES the right to appeal the Magistrate Judge's recommendation.  *See Thomas v. Arn*, 474 U.S. 140 (1985); *United States v. Walters*, 638 F.2d 947 (6th Cir. 1981).